The next United States v. Kunz Good morning. May it please the court. My name is Ann Berger, and I'm here on behalf of Appellant Victor Kunz. At a supervised release violation hearing, the District Court imposed a computer monitoring condition of supervised release that incorporated, by reference, a probation computer monitoring program agreement. The court imposed the condition over objection and in the face of undisputed evidence from the defense's forensic computer experts that several of the probation program's conditions were unworkable and vague. The court did not with respect to Mr. Kunz, but instead, and I quote, because it's the condition that we've been ordering in all these kinds of cases. Now, Ms. Berger, could you help me a little bit with some of the background here? Do you know where these conditions, that is to say the conditions of the program, come from? I mean, I take it that these are not things that this particular probation officer's thought up and applied to Mr. Kunz, right? I think you're right, Judge Lynch. This was the first time that I had laid eyes on the program conditions. I know that at this point, having looked at the record in the Browder case, when I think this court had occasion to, although it didn't rule on the conditions, talk about them. Yes, some of us are inclined to dictate. So those conditions, at least in Browder, some of them were the same, but there were many differences. So it looks like there was an evolution over time between the program conditions. Yes, and we've looked into some of the judgments in other cases in my chambers, and we've seen these in the Southern District and in the Western District in similar situations. And one of the reasons why I'm asking about this is it seems to me that there is something problematic about all of this, that we are taking up in these individualized circumstances things that are not individualized. That is to say, clearly, you're not contending that the district judge was not intimately familiar with Mr. Kunz as an individual. Correct. And looked to his history and decided, and you're not challenging this, that it was appropriate to have a computer monitoring program. That's correct. And so the question really is, what, if anything, is an appropriate mechanism for courts to review the sort of specialized technical details? And I realize that there are different things that you're objecting to, and we can talk about them one by one. But some of them, from your expert, are sort of technical computer stuff, which I can imagine a judge having hearing about it and trying to hear competing experts and then to maybe construe these conditions in one way or another. But I have trouble imagining that the right way to do this is every time there is a reimposition of a computer monitoring condition, or every time the probation department discovers some new type of computer program that people could use to evade their monitoring, that probation officers have to go back in every individual case of all of their caseloads to the different district judges who imposed the condition in the first place and say, you know, we've now added that no one can use the C-MEN Tech antiviral program because there's a way that you can hack that to escape the probation department entirely. And then each individual judge has to decide for each individual defendant whether it's appropriate to update the program, the computer monitoring program. Do you see what I'm getting at? I do. Can you help me out? How are we supposed to go about this? What are you actually even asking us to do in this particular case? If we were to remand this to the district court, what are we asking Judge Siragusa to do? So, I would have two points. First, Mr. Coons had had a computer monitoring condition in place for over 15 years, since 2005. We have no objection to a condition of that type being in place. In terms of the meat of the court's question, I made a proposal to probation that was rejected that included language that, and again, this is assuming that the conditions mean not what they say exactly, but designed to get to circumventing. What I proposed was that the language in the condition imposed by the court generalize with the defendant shall not attempt to circumvent the monitoring software and or hardware in any way. And I also proposed an including, but not limited to, and included some of these examples. I think that would remove the issue, because I think if the conditions, I guess I should step back, if the conditions don't mean exactly what they say, and if they're really just designed to get to circumvention, then that would address that issue. Could you repeat that language one more time? The defendant shall not attempt to circumvent the monitoring software and or hardware in any way, and then I go on from there. I didn't read that part, but including, but not limited to, and then I list the uses in private browsing, using computer evidence cleaning utilities, using encrypted email accounts, and so on. Isn't this, and it's very helpful as part of this discussion, but I'm wondering couldn't some of that be accomplished simply by construction? We could so construe some of these things. For example, it strikes me that even looking at this in a fairly literalistic way, maybe not quite as strictly as Justice Scalia or Justice Thomas might, it's not easy to believe that by saying that he shall not use encryption, he is prohibited from paying with a credit card on Amazon's website because it's an HTTPS secure encrypted site for that purpose. I mean, that can't be what this means or is intended to mean, and if we need to say that explicitly, maybe we should say it or someone should say it, but it's very hard for me to think that there's any realistic possibility that someone is going to be brought up on charges for doing that, something that he did not initiate, the encryption, and that is a standard thing that has no evasive potential at all. I feel like there could be instances, and I'm thinking in particular about Mr. Browder, just from the record in Browder, where there was evidence of some type of effort to circumvent on his part, he was highly skilled with computers, had a lot of technical knowledge. But that's getting us then down to a very individual level, and I'm still lost as to what we can do between saying something like, in Browder, this kind of program is okay, period, because we can't get beyond it, and getting down to a degree of detail of an individual and what that person can do and cannot do, which is very hard for me to understand. I mean, I'm still a little bit lost as to where in the middle we can come up with something that works. I understand you're saying just an okaying something under Browder and saying it's all fine can allow anything. On the other hand, I'm a bit lost. What do we do? Judge Calabresi, looking at the program agreement terms, I found myself a bit lost. I use computers for work quite a bit, but some of the conditions were beyond my knowledge and expertise. And I think one of the problems... They're beyond yours. They're way beyond somebody who's 90 years old. I feel like one of the concerns or one of the issues that we've raised with respect to simply generalizing is that, in this case, we have some conflicts potentially that were created. And I'm not sure what they mean. We did not raise a privacy issue with respect to the privacy language that appears to be in conflict where the district court imposes language that talks about how the defendant's privacy interest in the material, as long as it's not connected to illegal activity, will be protected as much as possible. But then the program agreement talks about how the defendant affirmatively waives any privacy interest in any of the content on the devices. We could look at that and say, interpret them to clearly retain a privacy interest since the explicit language in the first part of the provision says that the petitioner or the probationer will undertake efforts to protect his privacy as we look at these matters. But let me return to my colleague's question for just a moment. I mean, if we were to interpret, for instance, I shall not use any type of encryption unless pre-approved by the probation office, if that were interpreted to refer to use of encryption so as to circumvent monitoring or to remove the ability of the probation department to see what's on the computer, you're saying you would have no problem with that? That is typically something, language of that type is typically included with, say, the drug testing requirements. There's no need for the written imposed conditions to reference some additional document that's not literally incorporated into the conditions. I mean, I think the court's familiar with the language. Any testing mechanism that probation uses, the probation or supervisory... This is a problem because, and this isn't your problem specifically, you know, you have to defend your client in your particular situation. But don't we have to walk a line? I mean, if we have very general language solely in the court's conditions, then there's going to be an attack that that's too vague because if you say anything that the probation department, any kind of test they use is okay, then you just have to not evade the test. Well, that's giving more discretion back to the probation department. If you have a very generalized condition about evasion, then there's not very clear instructions to the supervised releasee as to what he or she can or can't do. But then if you make it very specific, you run the risk of maybe that's over-broad because this particular program could be used for non-evasive purposes. Or maybe then you have the problem that if you make it very specific, then next year that's no longer a thing and something else is a thing. And we have the problem of the dynamic versus static. So, you know, this is the kind of thing we're grappling with. Could you just, you know, as I see it, you've got like three categories of things. One is contradiction between the program and specific conditions, which maybe can be dealt with by some kind of construction or by saying the district court's rule controls. Then you've got the things that are highly technical and may read literally not include a requirement of intent. Okay, those two categories. What is the strongest example you have of a way in which Mr. Kunz's liberty is more restricted in some substantive way today under this program than it was previously under the conditions as they existed that you don't object to? I would point to conditions in the probation agreement, conditions 7, 16, 18, and 21. These all relate to a requirement of advance notice before things that are almost automatic or basically are so ubiquitous in our use of computers that it would basically make it almost impossible for Mr. Kunz to meaningfully use a device, whether a computer or a cell phone. There are things that, again, to read them, it's what our experts address. So someone in his situation who's thinking, okay, everyone, he works for a catering service. Everyone in the catering service has to use the office VPN to log in to get together that planning for this event. Okay. If they switch VPNs or if they suddenly tell him he has to use a VPN, then very clearly here he would be prohibited from doing that. What if he had a permission, a blanket permission to use the VPN for his employer? Like they get the job, they have a VPN, that's part of the deal. He says to the probation officer, do I have permission to use A&B Catering's VPN system? Answer, yes. Why doesn't that cover those changes? That would address that. Yes. Again, what I'm trying to get at is to what extent are these themselves relatively technical things as opposed to some effort to make the monitoring more intrusive or to limit his, substantively to limit his use of the computer rather than things that might be described as technical glitches that we might be able to figure out a way of having them fixed. And maybe we could have them, I don't know how we could do this, but set up some sort of world in which there's an administrative process for working some of these things out so that it's not case by case and dependent on which supervisor we see gets a lawyer and challenges these things or it comes up on charges rather than just being told by the probation officer, now you have to do this. Whether it's the intended effect or not, the effect is to discourage use of a valuable tool. I know what you're saying. And there's the second piece that is toward the end of the imposed condition where the court refers to a program in place at a particular time which suggests that then future versions of this probation monitoring agreement will automatically be... Well, and that's my last question because that strikes me as one of the more difficult problems to deal with. Because on the one hand, I fully appreciate your argument that giving the probation department carte blanche to totally change the deal is way beyond the powers that should be delegated. On the other hand, I have a great deal of difficulty with the idea that this has to be fixed and static in such a way that the probation department, simply to do tech upgrades of what their program is because we all know that these devices, the hardware, the software, all changes continually. It's one of your points that every time he logs on he's changing the operating system because there was an upgrade last night that he didn't even know about. But by the same token, how could it possibly be that these particular conditions that refer to very specific operating systems and so on stay in place forever even as the tech world changes? I think very clearly this was a well-intentioned effort on the part of the probation department to adapt and to stay on top of technological changes that certain supervisees might take advantage of in order to circumvent monitoring. The problem is by codifying, they've frozen. They've frozen these provisions and I think that that's the problem. And that's why my suggestion to the court was to characterize it in terms of not circumventing. And I can tell you at least at our end of the district I cannot think of a situation at a violation of supervised release hearing in that context where a successful argument has been made that a particular testing device was faulty. It should not have been used. The probation department shouldn't have used a particular testing device and therefore the defendant didn't violate it has not been proven that the defendant violated his conditions of supervised release. So that goes back to something that Your Honor said a few minutes ago. That's not something that I have seen happen at our end of the district and I wouldn't anticipate if we took a few steps back from this codification and made it a requirement that the supervising not tamper with the monitoring that would allow for technological changes in the future without I think getting into the situation where we are here where probation has extended into the province of the court and essentially taken some of the court's discretion. I'm not overly familiar with this program but the WhatsApp program as I understand it is the use of a text an ability to email where the communication is encrypted. So I get my email from a friend but there is an encrypted there is no ability other than my receipt of it which I can read to recover from WhatsApp the communication. I can see a probation department being concerned about use of such technology by someone that they are appropriately monitoring and under your proposal I guess the probation department would take on the burden of showing that the person who is being supervised started using that program because in an effort to evade monitoring. While on the proposal that the probation department came forward just the mere use of that would be enough. The fact that it involves encryption. Maybe there is some place in between that would be appropriate restriction. I'm sorry I kept interrupting. Maybe there is some place between showing an intent to evade monitoring and prohibiting all uses of encryption that would be reasonable and it would be preferable to both proposals. And I think that would be also getting this back into the province of executing the conditions which is probation's job. And that would be that before a supervisee was permitted to use an app a communications app, an email provider, something like WhatsApp they would be under an obligation to identify that to probation. And so there are aspects of the conditions that we objected to that we are not objecting to. Like for example, number seven, advance notice of email accounts, social networking accounts. That seems absolutely reasonable and that's not the type of thing we are challenging. But instead if the burden is on the person who supervised to alert probation to obviously Mr. Coons is under obligation to report new devices, but also new email accounts, new communication apps, things like that then again the burden would be on him and would get back into probation executing the conditions instead of imposing them. But are we the ones who can do that? My problem is I just don't know quite how we can be. The problem is there's no one we're trusting. We don't trust the district judge to do it right, we don't trust the probation to do it right and you're asking us to come up with something and frankly I don't trust myself. One of the options is for a remand at which time we could have a hearing and our expert could testify and we could flesh out exactly what these conditions mean. That would be a good start and that would not involve this court trying to I think step back from this issue. Thank you. Good morning. May it please the court. My name is Tiffany Lee and I represent the United States. I was going to start by just talking about that the standard with respect to evaluating what Judge Siragusa did here before the court is whether or not the district court abused its discretion  which kind of goes back to the question that goes back to Judge Calabresi's question like what do you do when you have standard details which are really probation's purview in terms of how they're going to execute the sentence and the sentence here was specifically that Mr. Coons was not allowed to use either computers or internet devices unless he either got prior approval from probation, prior approval from the court or participated in a computer and an internet monitoring program and this court has already held that participation in such programs the ordering of such does not represent an improper delegation of judicial authority simply because the deprivation of liberty occurs as soon as the district court says Mr. Coons, your internet and computer rights access rights will be restricted. Right, but here Mr. Coons through counsel said to the district court yeah I understand that and I'm not objecting to that requirement but you judge should understand that they are now the program that they are now asking me to be in is unduly oppressive and the judge's response as I read it was pretty much yeah well that's what they do now and so I'm just going to sign off on it without addressing the rather specific challenges that were made so what if anything is the standard you're advocating that once the district court says computer monitoring then there's really no judicial review whatsoever of what the probation department then undertakes to call computer monitoring? No your honor that's not what I'm saying at all because here is what Mr. Coons' remedy might be you gave the example of potentially if he were to use without intent of  something as benign as Amazon without knowing or being ignorant of the fact that that website might in and of itself have some encryption if a probation officer comes in and says well I'm going to do a violation petition because you were in contrary to that isn't it necessary for the supervisee to have some idea of what's going on and you say if he uses it in ignorance well he's not in ignorance anymore because his lawyer hired an expert who came back and told him that the Amazon website if I have anything that has HTTPS in it is in fact encrypted so now what does he do? Does he say well I'm just going to use it and then if I get charged with a violation I can go back and suppose it's someone who doesn't have the federal defenders and hire a lawyer or ask for an appointment of a lawyer to come in and make a test case out of myself is that the only way that I can challenge this or am I not entitled to raise a question ex-ante if this is what they're saying I have to do and I don't understand I think it's not, it wasn't so much that this is what they're requiring me to do and I don't understand it it's more this is what they're requiring me to do and it's going to take a lot of effort on my part to make sure I am in compliance it's not necessary it's too much of a burden on me if that is something that somebody living today has to be able to do to do a decent job then that is impossible to put a burden like that on somebody but some of the conditions though your honor, I mean some of them may be okay but what we're struggling with is things which you say you want this person to take a risk that he is violating his supervised release in order to do the kind of living that is today essential given the uses of these things and you know unless I said before I don't know what it is that we can do but a statement of advice seems to me something that cannot be right and that's where it comes down to your honor to the extent that if you were to let's say send it back to judge Saragusa and judge Saragusa says okay I've taken a closer look and I still find that they're all they're not unduly burdensome that in comparison to a complete and outright ban on Mr. Coons from using the internet which he could conceivably do if he has a record for that based on violations or everything you know there may be some very few people that you can do that but you're basically saying when you do something like that that somebody cannot live I mean you know you cannot live without using some of these things I know because I'd like to but I can't and I understand that too your honor I certainly cannot live without a lot of the technology that is available to us today but this is not you know the reality is that these these conditions while Mr. Grant did supply an affidavit to say why they would be pose difficulties I think the question is whether they're unduly burdensome and quite frankly at the end of the day it seems to me that thematically they all relate to the issues of encryption evading detection and you know to ensure that you know someone's not doing something nefarious on the internet given the fact that this is an individual who already has diminished rights because he's on supervised release these are the restrictions in which are the best the least restrictive in comparison to not allowing him any access to computers or the internet at all but what about the restriction I shall not use any type of encryption unless pre-approved by my probation officer my probation officer have you thought of does the government have any proposal of language if we were to find that overly burdensome or broad we'd have to send that to the district court to take a second look at that it's overly burdensome potentially to have to go get permission when your computer is being monitored specific permission to go to Amazon or to go to any other vendor or to do banking or to go to any website if those all involve encryption is there a limiting language that would achieve the purposes of the government equally well but that would impose less of a burden in your mind I'm not sure because it would be case by case basis if you had someone who was convicted of an offense that was all restricted to let's say like a white collar sale of pirated items or something then that might not be a good fit but for someone who's been convicted of child exploitation offenses on using the internet and who has also had some violations of his terms of supervised release I would say that that may be that may be a condition that would withstand scrutiny under these particular circumstances as related to Mr. Coons in terms of Now you're going back to saying that everything has to be that individual and that's again a problem that in each case has to be decided individually of what conditions are sufficient given this person then we're either asking a huge amount of the district judge more than that person can do one would hope there would be some kind of program for the district judge to attach to that some sensible people would work it out I agree it's the tension between individualized sentencing and the need for standards and standardization the government say that all of this has to be done individually I would have thought that the government's position here was that the district court assigns the person computer monitoring and then the details are basically standardized for what computer monitoring means in most cases I was trying to say that in the most cases format and I apologize if I misspoke to indicate that the government is not of the position that there should be standardization on the back end of things so the individualized sentencing comes from the first pronouncement that Mr. Coons use of the internet must be he can either not participate in computer monitoring, not get prior approvals from the court of probation in which case he cannot use the internet at all or he could get prior approvals from the court get prior approvals from probation or follow a computer monitoring program so now we're at the view of what does that computer monitoring program entail and many of these arguments are similar to some of the arguments that had come when initially there was dispute about which drug treatment provider or sex offender treatment provider probation might select that in which someone who's on supervised release would have to follow the requirements of a particular sex offender treatment or drug offender treatment program and again they had issues about the specifics of those treatment programs some programs may have required that the person on supervised release participate in very in depth counseling and whether or not these records would ever get released to probation in terms of confidential mental health disclosures but the reality is that this court at the end of the day said those details are within the province of probation because it would be very difficult to not sure but what's detail and what's too big and we drew the line at residential versus non-residential that's not just a detail that's a significant restriction on liberty so one of the questions that will always be involved is some line drawing between I say computer monitoring and after that it's up to the probation department to do whatever the heck they want to do and call it computer monitoring on the one hand and I as a district judge have to tailor the individual requirements to the individual and somewhere in between there there's some place it seems to me where we are opening up to the probation department some undue discretion and we just have to figure out where that line is I'm tempted, there's a world in which I'd be saying to you guys you're all sensible people, go work this out but that doesn't work in the criminal justice system because there's nobody, it's not like a class action there's nobody who can speak for all the supervisees and work out something with someone on behalf of the justice department and come to some sensible resolution that will bind everybody so we're kind of stuck in a place where I'm saying, you two can probably come to something that would settle this case, well maybe that wouldn't be so but we'd just leave it for the next case where somebody else is going to make the same argument when I was a trial attorney and Ms. Berger was my adversary there were instances in which we did sit down together on a case by case basis and resolve these things with respect to stipulations that said, the question here is whether the standards that have been promulgated by probation here whether or not they meet the test in terms of whether that you know, it's the government's position that it's not an improper delegation of authority so the question is whether or not these terms and conditions are such in which Mr. Coons would be able to follow and if it became too onerous in terms of his not understanding what it is that he needed to follow whether or not he would still have the opportunity to ask for a modification clearly the supervised release statute does provide for that opportunity the government believes that this sentence should be affirmed he sort of did, right? I don't like what was Ms. Berger's list 7, 16, 18, and 21 and here's why and the judge's response was just, well that's what they do so that seems like not what you're saying could be done, which is seek a modification and then have that modification decided on the merits but I think this was the challenge was much more generalized it was much more, well given the state of computer I could read this to mean that any time my software updates practically when you go to a district judge who is busy in a situation like this, can you possibly expect that district judge to do more than what Sierra Cruz did and say, well come on, that's the way it is I've got a thousand cases, I can't be dealing with that with everybody just realistically what you're asking us to do is something that might work if this were 1900 and judges had little to do in terms of seeking the modification once there was a circumstance in which it implicated it this court should affirm thank you, your honor just briefly, my opponent mentioned that a court ordering the computer internet monitoring program is not an improper delegation I think I referred in a general way to Browder the court in that case said that it was not clear that the district court ever imposed on Browder the specific terms of monitoring reflected in the probation office's policy here, I think we can infer that the district court did, given the court's attention was brought to them but then the court went on to say that on remand the district court should review the computer monitoring condition of supervised release and restate the terms of Browder's computer monitoring condition with greater specificity when I looked at that record I did not see any indication that was easy to find from the district court in terms of whether that was done or not I'd also like to comment on the government sort of dichotomy of Mr. Kuhn could choose to not get permission and not use the probation program or he's got to use it I think that's really not a reasonable choice I think this is a case where nowadays it's difficult to survive in the world, let alone have a job or be in school without having access or use of a connected device and so instead I would ask the court to look at this in terms of subgroups and categories within those who have devices that are being monitored and certainly there will be some people for whom a condition is strict and owners of these would be appropriate with our condition that they are not for Mr. Kuhn. Thank you. Thank you both and we will take the matter under advisement. The next case is Retail Pipeline v. Lee on the Proof Good morning. May it please the court. Jennifer McDonald on behalf of the Appellant Plaintiff Retail Pipeline This appeal and the district court's decision concern really the fundamental roles of contract interpretation and the standard by which a district court must adhere at the summary judgment stage   and that he was not the plaintiff's client. He was the plaintiff's client on the summary judgment motion and lost, so all inferences should have been construed in my client's favor. In this situation the contract claims concern breach of the total consideration that was due under a performance earn out provision And your position is that under that contract this roadmap was incorporated by reference, is that right? No, I think my position is a The roadmap itself is not a contract that the parties executed. It is extrinsic evidence. This is goes back to the ambiguity of the term Flowcasting 2.0 What exists to define that term that is extrinsic evidence to define the term Flowcasting 2.0 or similar product So the parties met Is there, what is the contention of The obligation is to pay I'll call them royalties, that's probably not a technically correct term, to pay a sum for every sale of Flowcasting 2.0 or similar product What is the similar product that, on which they did not pay royalties? I think both of those issues, both of those statements that you just made, Your Honor Flowcasting 2.0 or similar products are The parties dispute what that means. Okay, fine So you tell me, what is it that it means Under what interpretation of what it means, was there something sold on which a royalty is owed? Flowcasting 2.0 was never created. What it should have been So the question then is if you're not contending that they failed to pay on Flowcasting 2.0 or similar product, what is there in the contract that obligates them to create a similar product or Flowcasting 2.0? I, just to be clear I am contending that they failed to pay on Flowcasting 2.0 or similar product because it was not created Well, wait, wait, wait, no, no, no That's a bit of a jump, isn't it? Because the contract says for certain kinds of products we're going to pay one thing for other kinds of products we're going to pay another For Flowcasting 2.0 or a similar product, we're going to pay something else And you just told me there is no Flowcasting 2.0 or similar product. So where does there become an obligation on them to pay something? Then that would write this term completely out of the total consideration of the contract. Why? They did actually pay some things, didn't they? They paid something Under Revenue Stream 2.0 it's a, I think there's a factual question How much of a similar product it is Are you saying that this contract says that they must pay under or at least can be read as saying that they must pay for Flowcasting 2.0 or similar product and therefore that they have a duty to do it That it is ambiguous in that sense that since it says that they must pay under that that that necessarily implies a duty or at least is ambiguous as to whether it implies a duty Is that your argument? I think that is I think if I understand you correctly that is the argument. This is total consideration is defined to include two different categories Similar to your honors security plan case the distinction from that case is that this is an ambiguous calculation for a performance obligation I don't understand why it's ambiguous If I license from a company the rights to produce a board game monopoly and I agree that I'm going to pay a royalty back for every unit that I sell Why does that obligate me to keep producing monopoly indefinitely rather than say this is going to sound very well so thank you very much but I'm giving you zero this year because we stopped making monopoly What is there that makes that a requirement that you would think it would be something to say explicitly that you have to actually produce this or keep doing this There's a revenue stream from Flowcasting 1 right? There's a revenue stream from Flowcasting 1.0 for the legacy product Does that mean that they're obligated to keep selling Flowcasting 1 Suppose they said look sorry Flowcasting 2 isn't working out we'll try to sell Flowcasting 1 for a while and if it doesn't work we'll stop selling that. Would that be a breach of this agreement? When we entered into it we took them at face value that they did not intend to sell Flowcasting 1.0 other than the two carve-outs in there If they had refused to sell to the two Flowcasting 1.0 carve-outs then that would have been a breach and back to your honors and I think it's a good question and it's a discussion there is no carve-out in this agreement that says they don't have to do that and again back to the security plans and that case involved a specific provision which doesn't exist in this contract and that was an unambiguous contract that case involved a specific provision that said defendant in that situation was under no obligation to maximize the revenue that would be used to calculate the earn-out payment and in that case this court remanded on the implied covenant claim even if you carve-out a statement in a calculation for an earn-out that says we're under no obligation to maximize I'm coming back to this I'm perfectly willing to accept the notion that terms like Flowcasting or similar products are ambiguous but what I still understand is where the ambiguity is as to the duty to do those things which are ambiguous and that's my question if you can convince me that somehow there is an ambiguity as to a duty to do those then I think one has to get to external evidence the other side suggests external evidence that there isn't a duty but that's external evidence when they say we tried but what is there that suggests that external evidence that that is an ambiguous question again what and I think the significance of this what makes it material to get to your question the fact that another product is mentioned is itself ambiguous as to whether there is a duty to produce it in other words if somebody says I will give you royalties on a banana product and I will give you more royalties on Monopoly you're saying that that fact suggests at least ambiguously that I have a duty to produce Monopoly I'm not sure I understand the party's intent under the express language of this contract the intent about whether or not this was going to be made I think you could argue is ambiguous our position is you start with we've got a term that's in the total consideration paragraph what in the contract suggests that there is a duty to do something specific about forecasting to and sourcing because we will pay you based on the performance of this product they're licensing an underlying technology here and they're saying if we use that technology your technology and we make money at it we'll pay you that doesn't say anything about we're obligated to produce something and then try to sell it if we determine that the technology doesn't work I don't see what in this contract gives any ambiguity about whether there's an obligation to produce this the contract just says if we pay you a revenue stream on anything that is similar to Flowcasting 2.0 whatever that means now there's certainly plenty of ambiguity about what Flowcasting 2.0 means or what would constitute a similar product but you are not suggesting that that ambiguity makes any difference you're not suggesting that there is something that should have been called Flowcasting 2.0 but wasn't you're not suggesting that they made a similar product and they pretended it wasn't similar and that's what the dispute is about and therefore we need to understand what the parties meant by Flowcasting 2.0 or similar product the issue isn't the ambiguity of what those terms mean, the issue is you're saying that the absence of any explicit provision that they are obligated to make something that would be similar to whatever Flowcasting 2.0 means in itself creates an ambiguity as to whether there is or isn't an obligation to do that so I disagree, there's no your honor started this by saying this contract says something to the effect of if we make it we will pay you on Flowcasting 2.0 or a similar product but nothing says there has to be a similar product nothing says we are undertaking to use our best efforts to create Flowcasting 2.0, nothing is saying we have an obligation to make something like Flowcasting 2.0 within the lifetime of this revenue stream and it seems to me you have a very interesting case if you said look, they deliberately slow walked the creation of Flowcasting 2.0 and then as soon as they were no longer under the temporal obligation to pay us then they released Stratocasting 1.9 which is nothing other than what is a similar product to Flowcasting 2.0 but there's no indication of any of that they just decided not to do this at all as far as the evidence seems to say no, it doesn't and I'll go back to they did not create what we call Flowcasting 2.0 they worked on a product a similar product perhaps and did they sell any of it that they owe you royalties on? they don't owe us royalties for what was generated but they did not and this gets to again I think the security plan where in the contract is the language that is ambiguous as to their duty to do this creation there is no what the meaning of Flowcasting 2.0 and what the duty with respect to that part is the ambiguity that's ambiguous but I come back to say that's ambiguous but where is there a duty for them to do something about moving to Flowcasting 2.0 what language anything in the contract that would be ambiguous as to whether they have to do it can you point me to it? there is no the contract is silent on the efforts that are required to be undertaken there is no carve out for JDA to not do it there is no express statement in here that says you have to do it to our specifications it's silent and on that it's ambiguous and I think we get to the extrinsic evidence why is the absence of an affirmative duty to do something an ambiguity as to whether there is an affirmative duty to do something how can that be? to pay us the consideration that we're due under the contract but the consideration is the payment of royalties on the sale of certain items, those items never came into existence so where is the duty on them I understand, if they used your technology and made something and made money on it they're supposed to pay you but where is there an obligation or what language would be construed as they're actually obligated to use their best efforts to create something that would fall within this description and would be commercially viable in such a way that you would be owed something I think this gets to perhaps the implied covenant claim that again was discussed in the security plan case where even where there's a carve out that they don't have to take those steps there's still an obligation on the behalf of the defendant when it purchases technology to not act arbitrary and irrationally what's arbitrary and irrational about deciding not to go forward with a rather complex enterprise to try to create something when presumably they did do something they met with you, they talked about these things they had consultations and at some point they decided not to go through with it how are you hurt by that I don't understand because the deal is pay on a product they've licensed the right to use your technology to make something that doesn't say they have to actually go through with it and that must happen all the time in this industry that somebody buys an idea and then it either does pan out and everybody gets rich or it doesn't and nobody makes any money and arguably then you have a contract provision that says we have no obligation to do anything with your product and here it simply says we will pay you revenue based on this product but wouldn't it be a simple matter to put in something that says you know and there's an obligation to use your best efforts to create make something of this best efforts is a different issue respectfully entirely well an obligation to use half hearted efforts an obligation to do something to try to make a product what is the language that you are saying we should read into this contract well I think it should be read into this contract the same effort that should be in any contract even language that says we are buying this product in the contract because we intend to produce and then intend to produce might be ambiguous as to whether we have a duty to do it and I don't even find that language that language is not in here it's simply we will pay you revenue based on a product they didn't carve out any exception they didn't carve out any statement saying we have no obligation to you to make it affirmative obligations and I think that's where the use of the term we believe is ambiguous because we and there is no extrinsic evidence to this point but we entered the contract believing they would make this product they hired Mr. Landvater they subsequently fired him for no reason in our position but they hired him to help move this forward and made decisions which again to the applied covenant claim we believe are based on one hand not talking to the other and intent by a vice president to effectively remove this product from the marketplace for competitive reasons. It's arbitrary and irrational because a rational person in their position would have known that they could make a lot of money by doing this and they still didn't do it because they were spiting you because they didn't want to pay you your share of the money that they would have made if they had gone ahead with this but it's arbitrary and something we don't want to do anymore. I don't believe that was exactly the decision. What is it that they did that was arbitrary and irrational? Going back to the beginning of why they wanted this product they had several options and they chose we're going to do this and create a new product at that point in time we do think that there was an intent to create a new product but there was also an intent to remove our product from the marketplace. They get into this contract and after my client starts saying you're not giving us resources that we need to do what we agreed to do and again this is looking at the extrinsic evidence there was a whole conversation in December of 2013 which the parties talked about what was going to be agreed to the CEO says that's all we were talking about for a year. We knew what this contract was about. This contract from the CEO of JDA's position was all about Flowcasting 2.0 just as it was for Mars. My client starts to say you're not giving us the resources that we need to make the changes and they remove him from his position and put him in another group where he was not in a position to make any of those changes. He continues to advocate for the changes and he's ultimately fired and before the earn out period expires they remove other prime people from their roles and move them to other projects so that we cannot realize the full benefit of the earn out payment under the contract. So again looking at the implied covenant I do think this case in that respect in security plans was cited in JDA's brief but in reviewing it I think it's very applicable to the situation on the implied covenant claim. The distinction for the contract claim in that case was that it was an unambiguous calculation versus the ambiguous calculation we have here. Thank you. I request that you remand for trial. Good morning. May I please report. My name is Justin Barnard. I'm counsel for Appalachia's Blue Yonder and Blue Yonder group which have been referred to throughout these proceedings as JDA which is its prior name. I think what's possibly most notable about this contract dispute has come out in the questioning today what a fundamental disconnect there is between retail pipelines claims of breach of contract and the actual text of the agreement that the parties executed. They are effectively bringing suit for breach of obligations that the parties never agreed to. They tried at length to get JDA to I agree with you Judge Calabresi. I appreciate that Judge Calabresi. Let me say that as to the breach of contract claims specifically, you don't need to look to extrinsic evidence. The contract is clear. It's a very simple earn out contract and as was clear from the questioning of Ms. McDonald there's no affirmative obligation in the contract to develop any product. Mr. Barnard, it's your point that when the conversation turns from the breach of contract to the breach of an implied obligation under Delaware law we do look to what is a kind of extrinsic evidence of negotiating history because under Delaware law the breach of an implied covenant cannot be used for the purpose of inserting into a contract something that was declined during the negotiations. Is that the distinction that you're making for how we can and can't use extrinsic evidence here? That is exactly so, your honor. And the Delaware Supreme Court has been clear that when there is a claim of the breach of the implied covenant it in fact invites review of the party's course of dealing and their negotiations. Then we should look to their description of the court of dealing according to the negotiations to see whether there is an implied covenant and I'm interested that she never made any argument of that sort but of whether the implied covenant of Delaware law, which does say you should look to what went on, then shouldn't we look to the things that opposing counsel was telling us to look at? Well, your honor we have sworn testimony from one of Retail Pipeline's two principals, Andre Martin that in the course of negotiations they asked for a commitment to develop specific product features. They asked that those features be completed and merged within a year. They asked that the earn out not start until they had a product that they felt would give them a chance for success. And he testified under it that JDA did not agree and they proceeded and signed notwithstanding that. That is the record that is before the court. This is Mr. Martin's testimony question. And you signed the ultimate contract with no guarantee that these features would be included, correct? Answer is yes. And I said that earlier and I repeated it. It's not because we didn't ask. But they came back and said we can't put that in the contract. And then he further testifies that he suggested to Landvater, the other principal, that they insist on a provision that if the full earn out wasn't reached in the term the set term, the parties could come back and negotiate. And Landvater said no, JDA refused to pay the full amount of the revenue if those goals were not met. So that's what their version is, or at least what their principal has acknowledged. That is what their principal has acknowledged. And Delaware has defined its implied covenant of good faith and fair dealing very narrowly. And it has been clear that it only will function to impose new obligations to the parties. It's not that they didn't consider something at the time they were contracting. It's that they could not have anticipated the circumstances that transpired later. Here we have a circumstance where the principal one of the principals of retail pipeline says, yeah, we discussed these issues. We tried to get them to agree to develop a product that we thought was best situated to take advantage of this commercial opportunity. I'll tell you what my problem with Delaware law is. There's plenty of language exactly as you say and there are plenty of cases where it's a practical matter in that case they found an implied covenant was reached. So to a point of cases going every which way that even somebody who loves to certify as much as I don't know what we'd be certifying because they're deciding case by case. But perhaps most simply under Delaware law if there's a gap, you're talking about a gap that's left by a rejected term and the extrinsic evidence shows that this was something the parties didn't think about in the contract. Delaware law is pretty clear. The implied covenant of good faith doesn't apply because that would be essentially rewriting the contract that the judge did not reach in the argument. That's exactly right. And I would, in responding to Judge Calabresi's comment about the Delaware jurisprudence on this issue, I think if you look at the cases cited in our papers, there's one 10th circuit case that the appellant has relied on heavily. But the Delaware cases on this issue, on the obligations under the implied covenant, are fairly closely in line over the last 15 years at least. In a line of cases, they have defined the implied covenant narrowly. They have said that where the parties could have anticipated an issue, even when the result is quite harsh, that they are going to impose and enforce the contractual bargain that the parties made, not the one that the losing party or the party who was dissatisfied wished they had made and were unable to do so. I would draw your attention as well to Delaware law on the question of the duty to maximize a settling party's earn out because this is essentially what this case is. The appellant says that JDA did not do enough to bring a product to market and give them a chance to completely earn their earn out. Going back to some of the factual questions that arose during my colleague's questioning, there actually was a JDA flowcasting product that was developed. It was announced in April 2014. They marketed it. They sold it. They credited that revenue towards the earn out. This is exactly how the earn out contract was supposed to function. That is undisputed. They just dispute whether the product that was sold had all of the features that they felt were necessary to qualify as flowcasting 2.0. To go back to my original point, where the contention is that JDA did not do enough to allow retail pipeline to complete the earn out, the Delaware Supreme Court has said unambiguously that absent some contractual guarantee of best efforts, after some post-closing obligations that address this issue, it is not the role of the implied covenant of good faith and fair dealing to step in and require a purchasing party to exercise some specific level of efforts, take any specific actions to maximize the selling parties' earn out. If your honors have no further questions, I'll yield the rest of my time. We'd ask that you affirm. Thank you. I do want to address the implied covenant claim, which is a part of this appeal. And that certainly is something we addressed in our briefing. I think the Tenth Circuit case on our tools, because it deals with an earn out provision, it deals with the implied covenant claim, is very similar here. This is not a situation, I want to draw a distinction between what was requested by my clients before the contract and what was not requested because they did not think that this would ever be an issue. What was requested in October of 2013 was very specific items of the software that was going to be created. What was not requested was a provision that says we are going to make the software because we did not, because as looking at extrinsic evidence and we're talking about the implied covenant claim, we do have to kind of weigh what the party thought about beforehand as the CEO for JDA said, and this is quoted in the briefing, this is all we were talking about for a year. We thought it was understood. You suggested earlier that this was a plot by JDA to get you off the market and they never had any intention of marketing anything that would look like broadcasting 2.0. Is there any, can you point me to some evidence of that intent in the record? That's a little more extreme than what I meant to suggest, so I apologize for that. The intent was certainly to remove us from the marketplace because we were a competitor so they did not want us hanging out there competing with their product. We have not made the claim that the intent was when they entered, before they entered into the contract, acquire this and kill it. So then what is the bad faith? And what is again, to go back, what is arbitrary and whatever capricious about their decision not to create something that would have generated more revenue? I assume they would want to create something that would generate revenue. So what is the evidence that they somehow decided at a subsequent point to just kill you guys rather than to incorporate your technology into something of theirs? Yes, so there's certainly the distinction between what's a business decision that someone would normally make but what's arbitrary? And this is that exact question is raised by the 10th Circuit in the O'Toole case on a very similar transaction that decisions can be made... But what is the evidence here? I don't want to hear about the 10th Circuit. They're far away and in another galaxy and they don't find us. I want to know what in this record suggests that kind of bad faith. In this record, what was not considered was what position Mr. Landvater would have in order to be able to prioritize the convergence of Flowcast 2.0. It was not considered that, and again this is just like in the other Delaware cases, that JDA was not actually going to for Flowcasting 2.0. But they did that in bad faith that they made a... I'm just trying to understand what kind of arbitrary non-business decision this would be. You suggested one was just wiping you off the map as a competitor but if that's not the motive or if that became the motive at some point, what is the evidence of that or what is the evidence of anything other than a business decision not to do these things? Failing to allocate the necessary resources to do what we believed was going to happen. But that's a choice. Isn't it a choice on their part as to how much resources to pour into this? Why isn't there any evidence that that was other than a good faith business decision about what would work and what didn't need to work? Because there's no evidence in the record of why they chose not to allocate... I don't understand even if their purpose was to take a competitor out of the market and offered that competitor in their contract certain things, why that is anything that we can worry about? Maybe antitrust, maybe other things but why is it... why does it violate a contract to buy out a competitor? And I apologize, that is not the focus of the implied covenant claims results from depriving us of our reasonable expectation of receiving the full value of our earn out which we believed and had reason to believe would be... You keep using the word believe and I have no doubt that you believe this, but where does your belief find some evidence that suggests that they wrongly fooled you, did something that led you to believe government was your home? That's the December 2013 communications and this is looking at the extrinsic evidence of in December 2013 after the communications the council just referenced involving Andre Martin JDA recognized they would not get us to sign this deal unless they got alignment on the date of December, the email trails are clear, we've got to get them to agree to this, they have the meeting where the parties sit down, they hash out what this is going to mean, so when I say I believe, I believe both parties intended when we entered the contract that this is what was going to happen based on those December 2013 communications. So again this is the extrinsic evidence that I think if there is going to be any consideration of extrinsic evidence, certainly from the moving party, this needs to be weighed by the fact finder and request that you remand for trial on those issues. Thank you. Thank you both, nice to be argued. The next case on the calendar is Capturino v. Pacheco. Thank you. Thank you. Good morning, your honors. May it please the court, John Romberg for Seton Hall Law School, Center for Social Justice, representing Mr. Castorina. In a moment, my co-counsel will give two reasons why, apart from the treating position rule, Mr. Castorina was disabled and unable to work. I will first explain why under the treating position rule applicable to Mr. Castorina's claim, the same conclusion is required. Under the treating position rule, if a treating physician gives an opinion about the nature and severity of impairment, if it's well supported by clinical and medical findings, and if it's not inconsistent with substantial evidence in the record, then it's entitled to controlling weight. Here, Dr. Dasa, Mr. Castorina's treating physician, he gave his opinion that Mr. Castorina could not perform the functional requirements of sedentary, unskilled work. Dr. Dasa was the treating physician before June of 2009. He'd already submitted a report in June of 2007 describing Mr. Castorina's functional limitations. In June of 2009, he submitted a report. A further report said this is a follow-up orthopedic visit, said Mr. Castorina has been under my care since 2007. There's letters in the record from Mr. Castorina's attorneys in 2007 saying that Mr. Castorina had been seeing Dr. Dasa for several months prior to the 2007 report, and multiple times, three times after June 2009, Dr. Dasa repeated and adopted his prior, more detailed conclusions that Mr. Castorina was completely unable to work. His prognosis was guarded and that he simply could not work. In fact, as time went on, Dr. Dasa saw Mr. Castorina between 2007 and 2013. From the time of the very detailed 2009 assessment, over the next year and a half, Dr. Dasa's assessment and very detailed treatment notes showed that Mr. Castorina was getting worse. The prognosis went from guarded to guarded to poor. He took him from being on Vicodin, which is hydrocodone, to Embedda, which is morphine, a more powerful opioid. Everything indicates that Dr. Dasa, as a treating physician, repeatedly gave his well-supported opinion that Mr. Castorina couldn't perform the sitting, lifting, or hand movement requirements of sedentary work. Let's try to be very concrete here because I understood the district court to be saying and the magistrate judge to be saying that in fact, Dr. Dasa had only seen your client twice, in 2007 and 2009, and gave his opinion on those occasions. Then I understood it to be a fact that thereafter Dr. Dasa continued his treatment. You are saying that that is a myth?